**In re D.A. ELIA CONSTRUCTION CORP., Debtor.**

**Bankruptcy No. 94–10866 K.**

United States Bankruptcy Court, W.D. New York.

Feb. 10, 2000.

William F. Savino, Damon & Morey, Buffalo, NY, for debtor.

Garry Graber, Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, NY, for Joseph J. Naples and Associates and Naples Claims Management, Inc.

William H. Gardner, Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, NY, for Niagara County Industrial Development Authority.

MICHAEL J. KAPLAN, Bankruptcy Judge.

Now before the Court are the Chapter 11 Debtor's objections to two pairs of claims. The objections are to the timeliness of the claims.

One pair was filed by two related entities: The claim of "Joseph J. Naples and Associates" was filed on February 2, 1998, in the amount of $85,826.77 and the claim of "Naples Claims Management, Inc." was also filed on that date, in the amount of $26,405.98. The other two claims are the $221,804.15 claim of the Niagara County Industrial Development Authority, which was filed on March 8, 1999, and that entity's amended claim of $147,273.67, filed in December of 1999. The claims bar was July 18, 1995.

As to the Naples entities, the Debtor had listed these claims in those amounts in its original schedules and statements, but designated them as "U–D"—unliquidated and disputed. The Naples entities argue that notice of the bar date issued by the Debtor was neither prominent nor obvious (and this Court agrees). They further argue that allowance of their claims would have no effect whatsoever upon efficient court administration, and that the allowance of the claims would not be prejudicial to "any party." As to the latter, they say that the claims were so well-known to the Debtor at the time of filing that they were listed by the Debtor, and were included in the Debtor's calculation of the total liabilities as listed in the required Summary of Schedules. Allowance of the claims would not diminish distribution to any other creditor, they argue, nor would it preclude a "substantial surplus" to the Debtor and its shareholders. Finally, they claim that they acted in good faith, the delay in filing being attributable not only to the insufficiency of notice, but also to their prior attorney's "mistaken belief" that the necessary filings had been completed either by the Naples companies themselves or by the Debtor's inclusion of the Naples claims in its petition and schedules. (The Affidavit of the attorney has been filed.) Thus, they attempt to establish "excusable neglect" as defined in *Pioneer Investment Svcs. Co. v. Brunswick Assoc. Ltd. Partnership,* 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993).

The Naples creditors also claim that the Debtor's objection to the timeliness of their claims was itself untimely under the provisions of the confirmed plan.

Now the background of the NCIDA claims. The NCIDA filed its original claim in the amount of $221,804.15 on March 8, 1999, and filed the amended claim of $147,273.67 in December of 1999. The Debtor even now remains involved in dispute resolution in another forum (arbitration) with the NCIDA wherein the NCIDA has acknowledged that it owes more to the Debtor than the Debtor owes the NCIDA. Consequently, the NCIDA does not seek payment, but rather seeks allowance only, so that there will be no doubt of its entitlement to offsets of the claimed amount.

This claimant too attempts a *Pioneer* showing. It alleges that its prior attorney became mentally impaired in a degenerative way during his representation of the claimant in connection with this Debtor. This mental condition was not known to the client. The attorney allegedly is no longer practicing law because of the mental impairment. Other than that, neither the NCIDA nor its substitute counsel can explain why the prior attorney did not file a timely proof of claim.

To make matters worse (from the claimant's perspective), that former attorney commenced an interpleader action against the Debtor in State Court two months before the bar date, wherein he specified that there was a net amount owed to the Debtor by the NCIDA, and he failed to explain how that result was reached, not even alleging that the Debtor still owed the NCIDA money that had been offset in the calculation.

The Debtor commenced the arbitration action against the NCIDA in September of 1999, and so long as the lateness of the claim does not, as a bankruptcy law matter, preclude offset of what the NCIDA is asserting as claims against the Debtor, the NCIDA is content to have the substance

and merit of its claims heard in connection with that proceeding. In the meantime, the NCIDA has commenced a professional malpractice action against the attorney, who has not practiced law since late 1997 (allegedly) and is generally thought among legal circles within the community to be under constant care in his home, suffering from some form of dementia resulting in de facto (as opposed to de jure) mental incompetence.

The responses to these two claims objections thus raise *Pioneer* issues ("excusable neglect"). But the Court finds that neither are *Pioneer* matters in fact. Rather, the Court finds that the excuse of the deficient notice as to Naples is mere pretext, and the claimants' failure to file was not neglect. The Court also finds that because the NCIDA does not in fact seek claim allowance, but rather wishes only to establish offset rights, that issue is resolved by an additional finding that there has been no discharge of this Debtor; setoff is intrinsically a discharge matter, not a "claims" matter (though the two could be intertwined in cases in which there is a discharge).

## BACKGROUND

The facts are a simple story, though not capable of being briefly told. The Debtor is a family-owned construction company that had been engaged primarily on government projects. It was performing a number of major contracts when its bonding company "pulled" the company's required bonding. The bonding company ousted the Debtor from, and took over, a number of public works projects. Family members were guarantors of the Debtor's liability to the bonding company, and to the extent that the bonding company expended funds to complete projects, to extinguish liens, etc., the guarantors had substantial personal exposure and concerns.

The bonding company sued the corporation for, *inter alia,* contract violations, and sued the family members on their guarantees in United States District Court for this District, for indemnification, etc. All the defendants countersued for wrongful termination of the bond, among other things.

The family put the company into Chapter 11 and proposed as individuals to loan money to the Debtor–in–Possession to keep it operating in some fashion. This was thwarted when the bonding company persuaded the District Court that such a loan would violate earlier provisional remedies that the bonding company had obtained from that court, restricting the family members' alienation of personal assets.

The Debtor–in–Possession consequently ceased doing business and set about the task, with permission of this Court, of converting its assets to money. Physical assets were surrendered or liquidated. (Although the term "mothballed" was used by the Debtor in some earlier hearings in other regards, the Court does not know what, if anything, was "mothballed.") The major remaining assets consisted of lawsuits; not only the counterclaim against the bonding company, but also collection actions for substantial amounts of money on various construction projects. Some such suits were straightforward actions by the Debtor against state agencies and local or regional Industrial Development Authorities. Others were counterclaims or third party claims or the like, in connection with suits by others.

Obviously, it could benefit the Debtor's creditors for the family to control the litigation, so long as the family funded the fight to the extent of their own benefit. So the Debtor proposed, and this Court confirmed, a "reorganization plan" that never once mentioned any possible resumption of business. Rather, the Plan confirmed by this Court dealt only with prosecuting the various lawsuits and with distribution of any proceeds thereof. The Plan did not invoke the Chapter 7 distributive provisions specifically, but rather said: "The Debtor shall make distributions in

accordance with the priorities established by the Bankruptcy Code...." (Section 3.1 of the May 10, 1996 Plan.)

Certain injunctive language was carried over into the Plan and the Order of Confirmation, but a provision for "discharge" that was discussed in the Disclosure Statement was not contained in the Plan, or in the Order of Confirmation, both of which were prepared by the Debtor and its counsel. This writer is reasonably certain that if transcripts were produced for every hearing and continued hearing on the various plans and disclosure statements in this case, it would be discovered that I specifically refused to grant a discharge, and found that this Debtor could not be discharged because the Debtor was not continuing in business and (of course) the Debtor could not be discharged in a Chapter 7 because it is a corporation. See 11 U.S.C. § 1141(d)(3). Whether the Court did or did not so rule then, it would so rule today if asked to rule that the omission of language of discharge was inadvertent or a mistake or error.[1] This Court has consistently treated this as a liquidation plan and even *sua sponte* ordered the Debtor to account, in 1998, for suggestions that it was seeking to go back into business without seeking a plan modification to permit that.

The bar date for proofs of claims was contained in the notice that announced the hearing to consider the initial Disclosure Statement, and it announced a specific date, July 18, 1996.[2]

After confirmation, the president of the Debtor (who happens to be an attorney licensed to practice in this state[3]) pressed the litigation with the assistance of a number of other counsel whose employment was approved by this Court.

In any litigation in which family members were guarantors, they "paid their own way." (This Court rejects the suggestion to the contrary in one of the current claimant's submissions. The Court was very careful to be sure that assets of the estate were not going to be eroded or "gambled with" for the benefit of the individuals. And all parties-in-interest were notified of all hearings that the Court directed be held to examine any possible conflicts.)

The litigation with the bonding company went to a jury verdict on liability in the District Court here. The Debtor and the family members who were co-defendants in that action were successful on their counterclaim. Instead of proceeding to trial on damages, this Court and the District Court approved a settlement by which a million or more dollars were paid directly to the guarantors and by which over $4 million was paid to the Debtor, with all claims of the bonding company withdrawn. Thus, the claims of creditors that had been paid by the bonding company would also necessarily be disallowed as "paid." The amounts allocated to the Debtor were (and are) sufficient to pay all allowed claims in full, at least to the extent of what was owed at the time of the filing of the Chapter 11 petition.

The Plan had reserved to the Debtor the power to file objections to claims, and the Debtor began to prosecute claims objections in this Court after that settlement, and it has continued to litigate, and sometimes settle, other litigation in other courts.

---

1. The injunctive language in the Plan uses the phrase "discharged debt," reciting verbatim the Disclosure Statement language. But the paragraph for "discharge" that preceded the "injunction" in the Disclosure Statement had not been repeated in the Plan.

2. The notice was indeed defective. Contrast the exhibits in Appendix A at the end of this Decision.

3. The only importance of this fact is that the assets did not "liquidate themselves," so to speak, nor were they liquidated like realty or goods might be, such as at auction. There was substantial "sweat equity" involved in obtaining favorable results.

The precise settlement terms with the bonding company are known only to the parties thereto and to the District Court, pursuant to a confidentiality agreement. The Debtor insists (through its president) that it always intended to go back into business in its own name and that the duly-filed, timely-filed claims against the Debtor were kept firmly in mind in negotiating settlement terms, both in amount and in the allocation of the total settlement amount as among the defendant corporation and the defendant individual guarantors.[4]

At the time that this Court approved that settlement, it was represented to this Court (as noted above) that it appeared that all timely and valid claims would be paid in full, absent any surprises such as unanticipated administrative expense claims.

At all times thereafter, this Court understood this to be a "surplus" case. It remains so. Again, this did not happen automatically, but rather was the product of diligent effort by the president of the Debtor, the Debtor's counsel, and, perhaps, others. This was not a self-generating "pot," but from the time of confirmation it was a "pot plan," and the Debtor's assertion to the contrary is rejected for the following reasons:

4. It is suggested by counsel for the late-filed claims that this claim is disingenuous; that the Debtor's argument is tantamount to saying that more money could have been obtained but wasn't sought. That suggestion is rejected. It is very common for a party who is losing to offer a settlement amount based on the losses that are satisfactorily demonstrated. It would be surprising, in light of the jury verdict of liability, if the bonding company did not say, "We will not appeal and we will pay you the actual damages that we think you could prove in court, and spare your having to prove them if, if you'll waive compensatory damages, etc." Clearly, the "filed" and "deemed filed" claims against the Debtor would be front-and-center in any such demonstration, as would be the Debtor's predictions for bringing successful objections to various of the filed claims.

Every corporate "pot plan" in which the pot will consist of the proceeds of an orderly liquidation contemplates that some individual or entity will oversee the liquidation. If it is an owner who will oversee the liquidation, it is not for altruistic reasons that the owner accepts the responsibility. It would be an extremely rare circumstance (if ever) that a principal would volunteer services completely without compensation of any sort and completely without any hope or expectation of gain, but simply perceiving a moral duty to maximize the distribution to creditors.

More common is the principal who seeks to maximize distribution to claims on which she has given a personal guarantee or to maximize the recovery to creditors whose goodwill he may need in a future endeavor, or to earn (as a "Plan Trustee") commissions on the amounts recovered and disbursed, and so forth. Certainly, under the right circumstances such an owner might actually envision a surplus that could be used in any manner the principal sees fit. The Court recognizes the individual efforts by ownership in liquidating the assets in this estate. But this Plan was completely silent about what would happen to the non-operating corporate entity once the only assets it possessed had been reduced to money and distributed to creditors and stockholders.

One L. Andrew Bernheim is a purported owner of the Debtor. He has been assisted by the president of the Debtor and by an out-of-state law firm that "drifts" in and out of this case (purportedly on behalf of the Trustee in Bernheim's own personal Chapter 11 case), in causing a submission to be directed toward me in opposition to the allowance of the late-filed claims. I have not read the submissions, will not read them and order the Clerk not to docket or file them. They will be retained by me in chambers—unread, until a higher court orders them produced. They are an inappropriate submission—tendered after I sustained Naples' hearsay objection. The Court's findings in regard to the objection before the Court are without "benefit" of those unread submissions.

Ownership argues that the Plan must be deemed to be a "reorganization plan" because it is so labeled and because the word "reorganization" is contained in the title of Chapter 11. Nonsense. This was a "reorganization" plan in name, because there is no chapter of the Code called "orderly liquidations." Else this Court would have ordered the name changed. Moreover, it was the Debtor who invoked the process against creditors who were unwilling participants therein, and it is the Debtor who now is asking the Court to rule that it was entitled to discharge because going back into business was not "prohibited" by the Plan. Nonsense, again. This argument has the balance all wrong. Creditors have every right to believe that anything not "reserved" by the Debtor is theirs. In this Court's view, anything that a Chapter 11 debtor fails to address must always be resolved against the debtor, where the effect would otherwise deny ostensible creditors the right to have the merits of their claims heard. (Although the issue of whether timely-filed claims should now be paid interest in this case was raised only rhetorically, there could be strong arguments on both sides of that issue here.)

The following dictum is offered. The notion advanced by the creditors here, that late-filed claims must prevail against ownership if they clearly would so prevail in a "surplus Chapter 7" case, is not meritorious unless that is the way the Plan was set up.[5] Congress not only permitted, but encouraged owners to file troubled businesses under Chapter 11 before they ended up in Chapter 7. Congress offered many enticements toward that end, including the repeal of the former provision (contained in old Chapter X) which required a trustee to be appointed in every "corporate reorganization." And Congress gave the Debtor the "exclusive" right to file a reorganization plan in the early days of the case.

Such policy does not support the view that a plan that has a Chapter 7 result (a liquidation), should also favor late-filed claims over ownership's right to a surplus despite Plan provisions to the contrary. This is dictum because one claim of "excusable neglect" is rejected, and the other is not necessary to the result.

## THE NAPLES' CLAIM OF "EXCUSABLE NEGLECT" IS MERE PRETEXT

■ Pioneer stands for three major propositions: (1) clients may be held accountable for the acts and omissions of their chosen counsel; (2) "excusable neglect" is not limited strictly to omission caused by circumstances beyond the control of the movant, and (3) if the Court finds that there was "neglect," then the question of whether the neglect was "excusable" is "an equitable one" involving a number of factors.

■ The third of these propositions recognizes that if someone simply chooses "to flout a deadline," that is not "neglect." See *Pioneer*, 507 U.S. at 387–88, 113 S.Ct. 1489.

■ To this Court, *Pioneer* recognized that systematic indifference and systematic disregard are not "neglect." See *id.* "Neglect" may take the form of an omission, but not all omissions are the result of "neglect." They may be the result of choice, mistake, ignorance, naivete, incompetence, accident, coercion, etc. And while one might "neglect" to read one thing carefully, or neglect to respond to it properly, one may not "neglect" a whole sequence and system designed to inform him.

■ The Naples claimants' position is set forth by their then-attorney himself in a Declaration in which he states that, "yes" he "misunderstood" the law, but he was the victim of a defective claims bar notice:

---

5. The Court scoured this Plan and Confirmation Order looking for words that even obliquely or inadvertently might have vested

the rights to the settlement proceeds in creditors regardless of the lateness of claims. None were found.

he acted promptly upon discovering his mistake. When one reads their then-counsel's Declaration, one at first blush gets the image of conscientious counsel who had been making his way in the darkness. But a more careful reading discloses that the Declaration does not mention the numerous opportunities the Court itself afforded this and all creditors' counsel to avoid the error, and the vast information offered to creditors and their counsel in this case, at the Court's insistence. "Presumptuousness" is not "neglect," in this Court's view, and it was presumptuous for then-counsel to rely on "beliefs" and "understanding" not derived from the record and from open court proceedings that were readily available to him.

Unlike *Pioneer*, the bar date here was not buried in a notice of creditors' meeting. Rather, it was buried (the Court agrees that that term is appropriate, though the burying was unintentional) in a Notice of Hearing on Disclosure. However, long before that notice was sent, the first Meeting Notice in this case clearly set forth the correct statement that should have disabused counsel of any pre-conceived notion that scheduled claims never need to be filed. See Appendix B to this Decision. So then-counsel and his clients apparently also "neglected" to read that earlier notice before formulating the "beliefs" he sets forth about how the Chapter 11 process works.

He also seemingly did not take advantage of the Hearing on Disclosure announced in the same order that contained the claims bar, or of the later Hearing on Confirmation. Had he attended, he could have asked about his clients' rights and have raised them long before any Plan was confirmed and long before the bonding litigation was settled.

And perhaps a reading of the Disclosure Statement and Plan would have triggered some inquiry on then-counsel's part that would have led to the filing of the claims before, and not after, the settlement of the USF & G, or other, litigation. And there were other notices of other proceedings before and after the claims bar order that is here claimed as the excuse for neglect.

 The Court is satisfied that no cognizable reason for the failure to file the claim has been set forth, whether premised in "neglect" or not. To be precise, this is not an instance like that in *Pioneer* in which someone claims that it neglected to read carefully the single notice that cost it its rights. Rather, then-counsel's Declaration frequently speaks of incorrect "understandings" and "beliefs" regarding this specific case (as opposed to such proceedings generally) that came from unspecific sources. A party may not (A) ignore every opportunity and every safeguard that the Court, the Code and the Rules set up, (B) obtain erroneous "understandings" or "beliefs" from someplace else, when all the true answers are available in the public record or in open court, and then (C) claim that all of it was "excusable neglect" because a key provision in a key notice of a hearing to be held in open court was inconspicuous. That is mere pretext.

As the Supreme Court noted in Pioneer, "flouting" of an order is at an end of a spectrum of excuses that is far past "neglect." The claims bar order here was not "flouted," but the whole panoply of creditor-protection devices that led up to and followed the order and the omission were certainly ignored on a systematic basis.[6] That is a self-inflicted injury, much like a student never attending class and then complaining that he missed the final exam

---

6. This is an oft-repeated scenario in bankruptcy cases. A claimant asserts that it was misled by, or overlooked, one notice or order. But the claimant has no explanation of why it took no action on any of the myriad other notices, hearings, and opportunities to be heard. The Declaration here at issue pretends that this Court's tireless attention to the notice requirements of the Rules and perpetual insistence on the conveying of meaningful information to creditors, is all to be ignored if the Court fails to "catch" a caption—and typeface—deficiency in what is, admittedly, an important order.

because he didn't know when and where it was given; that is not "neglect." And in any event it is not "excusable neglect" even if all other Pioneer factors were found in favor of Naples.

## THE NCIDA CLAIM

There is no discharge of the Debtor. The NCIDA's motion to reopen the period to file claims is deemed to be a motion for relief from the injunctive effect of confirmation, and is granted. The force of the injunctive language against offset provided for in the Plan and over which this Court retained jurisdiction is lifted. Consequently, the NCIDA is free to assert its rights of offset.

SO ORDERED.